## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DWIGHT M. HILL,                              )
                                             )
            Petitioner,                      )        Civil Action No. 20-cv-1841
                                             )
        v.                                   )        Magistrate Judge Maureen P. Kelly
                                             )
SUPERINTENDENT LAUREL HARRY;                 )        Re: ECF No. 1
THE ATTORNEY GENERAL OF THE                  )
STATE OF PENNSYLVANIA; *and*                 )
DISTRICT ATTORNEY OF ALLEGHENY               )
COUNTY                                       )
                                             )
            Respondents.                     )

### MEMORANDUM OPINION

Dwight M. Hill ("Petitioner") is a state prisoner currently incarcerated at the State Correctional Institution in Camp Hill, Pennsylvania ("SCI-Camp Hill"). On November 27, 2020, Petitioner submitted a "Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody" (the "Petition"). ECF No. 1. In the Petition, Petitioner seeks federal habeas relief from his 2008 conviction of Third Degree Murder in the Court of Common Pleas of Allegheny County, Pennsylvania, at Case No. CP-02-CR-12419-2004. Id. at 1. For the reasons that follow, the Petition will be denied.[1]

## I.      RELEVANT FACTUAL AND PROCEDURAL HISTORY

On February 5, 2008, Petitioner pleaded guilty to the following offenses at two separate but related criminal cases. At Docket No. CP-02-CR-13731-2004 – which is not the criminal case from which he seeks relief – Petitioner pleaded guilty to:

- Rape, in violation of 18 Pa. C.S.A. § 3121(a)(1);

---

[1] Full consent of the parties to the jurisdiction of a United States Magistrate Judge was obtained on October 1, 221. ECF Nos. 13 and 18.

- Involuntary Deviate Sexual Intercourse, in violation of 18 Pa. C.S.A. § 3123(a)(1);

- Indecent Assault, in violation of 18 Pa. C.S.A. §§ 3126(a)(1); and

- Simple Assault, in violation of 18 Pa. C.S.A § 2701(a)

Docket, <u>Com. v. Hill</u>, No. CP-02-CR-13731-2004 (C.C.P. Allegheny Cnty.) (available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-02-CR-0013731-2004&dnh=rIeNLVwbCwyRlkX0m4f1TA%3D%3D (last visited Mar. 5, 2024)).

At Docket No. CP-02-CR-12419-2004 – which is the criminal case from which Petitioner seeks federal habeas relief – Petitioner pleaded guilty to Third Degree Murder, in violation of 18 Pa. C.S.A. § 2502(c).  Docket, <u>Com. v. Hill</u>, No. CP-02-CR-12419-2004 (C.C.P. Allegheny Cnty.) (available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-02-CR-0012419-2004&dnh=s%2B8zXtroSGP8XME0bAS91Q%3D%3D (last visited Mar. 5, 2024).

Pursuant to a negotiated plea agreement, the prosecution withdrew several additional charges against Plaintiff at Docket No. CP-02-CR-13731-2004 at the plea hearing.  ECF No. 15-1 at 1-2; <u>see also</u> Plea/Sentencing Hr'g Tr. dated Feb. 5, 2008, at 5-6.  Further, pursuant to that agreement, Petitioner was sentenced on the same date to an aggregate term of imprisonment of 30-60 years on all counts in both criminal cases, with credit for time served during pretrial detention.  ECF No. 15-1 at 42-44.

In its Opinion denying Petitioner's PCRA appeal, the Pennsylvania Superior Court set forth the following, very brief summary of the facts underlying Petitioner's conviction.

> On February 5, 2008, Appellant pled guilty to, inter alia, rape and third-degree murder in connection with his sexual assault of a seventy-nine-year-old patient at a personal care home. The woman died of pneumonia acquired as a result of aspiration in the hospital where she was admitted as a consequence of Appellant's assault. Also on February 5, 2008, Appellant was sentenced in accordance

2

with his plea agreement to an aggregate term of thirty to sixty years of imprisonment. Appellant filed no direct appeal.

Com. v. Hill, No. 390 WDA 2019, 2019 WL 6972643, at *1 (Pa. Super. Ct. Dec. 19, 2019).

The PCRA trial court provided additional facts in its Opinion.

> This matter arises out the guilty plea of Petitioner, Dwight Hill, on February 5, 2008 to third degree murder as a result of the death a 79 year old dementia patient. The Commonwealth's summary of the evidence at the plea hearing established that the patient was a resident in a personal care home in Elizabeth, Pa. where she had been since March 2001. (T., p. 9) The patient was completely dependent for her care and could only communicate on the most basic level. (T., p. 10) Hill was neither a resident nor an employee of the home but had been allowed to stay at the home with the consent of the owners. (T., p. 11). On August 14, 2004, an aide had prepared the victim for breakfast by bathing her, changing her diaper and then wheeling her in her wheel chair from her bedroom to a common area for breakfast. The aide then left the room to prepare another resident for breakfast. When she returned, the victim was gone from the common room and an urgent search found her in another bedroom lying on the bed in a fetal position with her pants and diaper removed with Hill standing behind her. The aide confronted Hill and as he moved away from the victim the aide saw feces and blood coming from the victim's anal area. (T., p. 14) The victim was transported to the hospital where an examination determined that she had injuries consistent with vaginal and anal sexual assault. (T., p. 17) The victim remained.in the hospital until August 21, [2004] when she died as a result of bronchial pneumonia.

ECF No. 15-1 at 125-26.

Given the arguments raised by Petitioner in support of his Petition, the Court notes the factual recitation presented by the prosecution during Petitioner's guilty plea colloquy before the trial court.

> August of 2004, June Loth was a 79 year old woman who suffered from dementia and resided at Scenery Heights Personal Care Home in Elizabeth Township where she lived since March of 2001.
>
> She was a total care resident requiring complete assistance in all activities of daily living, eating, bathing and toileting, not

3

ambulatory and spent most of the waking hours in a wheelchair or recliner.

She was living on a pureed diet to prevent aspiration. She was being tended by hospice care to assist her in all comfort measures while she was in Scenery Heights Personal Care Home.

The testimony would have been that June Loth was pleasantly unaware. She was a woman who would not ever cry out in pain or ask for assistance, but she could communicate at the very basic levels. And one of the things she liked to say was "Let's go. Let's go."

The personal care home was owned by Chester and Debra Wisnicki (phonetic). It had 42 residents on August 13th going into the 14th of August of 2004 – it has 38 residents. On the first level of Scenery Heights was the level which people with mental disabilities or patients that were totally non-ambulatory resided and there would have been testimony that Dr. Ingrid Holman (phonetic), personal care physician for the victim, saw her the day before and she had no bruises, skin tears. She had a few small abrasions on her hand from how someone had improperly moved her from a wheelchair, but other than that, she was mentally fragile but healthy.

She was also tended - - there would be testimony from Lynn Fair (phonetic), the hospice nurse, that she saw her on the 12th and she was doing just fine.

Several days prior to this incident, the Defendant is allowed to reside within the premises of Scenery Heights. He was supposed to be living at an off-site home. A state representative asked the owners of Scenery Heights, since the Defendant and his son were homeless, would they help him out with a rental property; however, Mr. Hill was allowed access into Scenery Heights without question. He was not employed there, and he was allowed to come and go in and out of these premises without question by the owners.

There would be testimony that various employees, this did cause them concern, but they felt that the Wiznickis had it handled and he was to be working there in the kitchen or doing odd jobs.

The testimony would have been from Lynn Rudy that she was the day caretaker for June Loth and she was doing just fine during the day of August the 13th of 2004. She ate her dinner, pureed diet; she was cleaned up, changed into her bed clothing and went to bed.

Testimony would have been from Mary Briggs that June slept through the night. She was incontinent so she wore a diaper. She

was tended to during the night; she was doing fine. Her body had no skin tears except for some small bruises on her hand.

The testimony would have been some time during the early morning hours of midnight that Mary Briggs encounters the Defendant in a common living area where it is sort of like a living room, television room, and the Defendant appears to be intoxicated. He is singing along to the radio and laying on the couch. This disturbs Mary Briggs, but she feels he must be allowed to be there if he is there, especially at night.

The testimony would have been also that Catherine Evans encountered the Defendant during the early evening hours and asked once again, "What are you doing there," and got no real answer.

Mary Briggs would have testified that at approximately 4:30, as is the custom there, she begins to get the residents up for breakfast, and that she gave a bed bath to June Loth, changed her diaper, put her in a little sweat suit outfit and put her in the wheelchair and wheeled her out to a small table out in the common area to wait for breakfast, that June was always the first person she got up, and then Mary went back to take care of June's roommate. That June would never get out of the wheelchair. She was not able to do anything, and she gave her some books to look at. She liked to look at books and play with paper.

That when Mary came out of the room with Alice Kelly, June was gone. Her wheelchair was gone and she panicked. She ran up and down the halls looking for June, and as she encountered a room, the rooms were looked through. She sees a light under a room that is vacant and cleaned and sanitized, waiting for a new resident, and she knows there is no one to be in there.

She pushes open the door, and when she pushes open the door, she sees the Defendant. His pants are undone; June Loth is laying on the bed. She does not have her pants/slacks on. Her diaper has been removed and is laying on the bed.

June is laying in the fetal position with her back end facing the Defendant's genital area. Mary screams at him and asks him what he is doing. He says that he is changing June because she had diarrhea.

He then attempts to push Mary out of the room and turns off the light. There is no feces on the Defendant at all, but when he does move away to turn off the light, she sees feces and blood coming from the anal area of June.

Mary then obviously becomes panicked and scared, and the testimony would have been that she ran for help and ran upstairs to see the aide upstairs, Catherine Evans.

Testimony would have been that Catherine Evans and Mary Briggs went back downstairs. The Defendant stuck to his story that he was cleaning June up, which everyone that works there knew that was not true, that June was a very modest woman and a female would clean June or change her, and you would never change anybody in a vacant, clean, sanitized room.

When they went in there, June - - they noticed numerous injuries, and I'm going to mark these for the Court. Your Honor, I note right now they will be a little out of order. I have marked these 3 through 10. The testimony would have been - - and I move for admission - -

\* \* \* \* \*

That from Mary Briggs, Lynn Rudy who then responded to the home and then from Lynn Fair and Dr. Holman, these injuries did not exist prior to the early morning hours of August 14th. The testimony would have been that she had abrasions to her face, her knees, her arms and her hand.

\* \* \* \* \*

The testimony would have been then that the owner came down. The staff attempted to have him call 911. He decided that he was going to go and drive to his daughter's house, which is the administrator, rather than call 911.

The testimony would be eventually, within a few minutes, Lynn Rudy responds, the day caretaker, and Catherine and Lynn and Mary contact 911.

The Defendant denied that he had anything to do with the assault on June. Testimony would have been from Dr. Dillon Gallon (phonetic) that the victim was transported to Jefferson Medical Center and that based upon the examination, although he was not able to do a full gynecological examination, that the injuries suffered by June Loth are consistent with sexual assault anally and vaginally, that she suffered severe bruising and contusions to her anal area as well as the other abrasions that the Court saw.

\* \* \* \* \*

6

The testimony would have been that Ms. Loth was admitted to Jefferson Memorial Hospital and as she was there, she began to decline. She developed bronchial pneumonia from aspiration.

From the moment that she was found, she was nonresponsive. Her dementia, she never could go back to baseline, Your Honor. That she was non-ambulatory, nonverbal, and as a result of this trauma, she was hospitalized, developed bronchial pneumonia.

Due to the fact that there was hospice involved, comfort measures only were given to Ms. Loth, and as a result of the bronchial pneumonia, she dies on August 21, 2004.

I will mark as Commonwealth Exhibit No. 11 - -  an autopsy was performed at Lab Case No. 04462 on August 21, 2004.

Anatomic diagnoses are as follows: Acute bronchial pneumonia; Subpart 2, history of physical assault with following trauma noted clinically on August 14, 2004; Subpart 3, clinical history of dementia; Subpart 4, anterior sclerotic cardiovascular diagnosis.

It was the opinion of Dr. Shaun Ladham that June Loth, 79 years old, white female, died as a result of acute bronchial pneumonia, physical assault which was documented clinically as contact fracture. This opinion is to a reasonable degree of scientific certainty by Dr. Shaun Ladham.

\* \* \* \* \*

A search of Scenery Heights yielded the following evidence: Back in the common room, I guess you would call it, a lounge area, underneath a sofa were found a pair of blue jeans and a pair of underwear.

The testimony would have been that at the time of the assault, the Defendant was wearing a regular sort of pair of Levi jeans. Later he was found to be wearing a painter style pair of blue jeans.

The testimony would have been from Detective - -   Lieutenant concerning that under this sofa, they found a pair of blue jeans and a pair of Jockey underwear.

In addition, in an adjacent bathroom, there was feces all over it, on the floor and on the sink, which he would have testified looked as if someone was attempting to clean themselves up.

\* \* \* \* \*

7

Those items were submitted to the Office of the Medical Examiner, Division of Laboratories, and Tom Myers would have testified to a reasonable degree of scientific certainty that there is semen consistent with the Defendant's blood type on the victim's slacks.

If I may, Your Honor, I realized I missed something. That when Lynn Rudy and Catherine Evans entered the room where June was attacked, they found feces and fecal matter on her lips and teeth and her lower teeth. They used a washcloth to wipe it out of her mouth. It was tested and found to be positive for fecal matter.

That the underwear of the Defendant contained the blood of the victim. That the diaper contained the victim's blood, and there was fecal matter soaked in both the underwear and the blue jeans.

\* \* \* \* \*

The Defendant was interviewed by Detective Carpiko. He denied having any sexual contact with the victim. He claimed that he was drinking that night and that he didn't know what happened.

With the admission of all of these exhibits, Your Honor, the Commonwealth would have rested.

Plea/Sentencing Hr'g Tr. dated Feb. 5, 2008, at 9-22 (oral motions omitted).

Petitioner did not file post sentence motions or a direct appeal.  ECF No. 1 at 2.

Accordingly, the conviction became final 30 days later, on March 6, 2008.  Pa. R.A.P. 903.

However, more than a decade later, on or about August 31, 2018, Petitioner filed a *pro se*

Motion for Post Conviction Collateral Relief pursuant to the Pennsylvania Post Conviction Relief

Act ("PCRA"), 42 Pa. C.S.A. § 9541, et seq.  ECF No. 15-1 at 45.  Although received by the state

court on August 31, 2018, it was signed by Petitioner on August 8, 2018.  Id. at 52.  Accordingly,

this Court presumes that the PCRA petition has an effective filing date of August 8, 2018.  See,

e.g., Com. v. Little, 716 A.2d 1287, 1288-89 (Pa. Super. Ct. 1998).

PCRA counsel was appointed, ECF No. 15-1 at 54, who submitted a no-merit letter and

moved to withdraw on January 22, 2019.  Id. at 70.  The PCRA trial court granted the motion to

withdraw and noticed its intent to dismiss the PCRA petition on January 29, 2019.  Id. at 91.

Petitioner responded to the PCRA trial court's notice on February 19, 2019. Id. at 94. The trial court dismissed the PCRA petition as untimely on February 26, 2019. Id. at 107.

Petitioner appealed on March 1, 2019. Id. at 108. After remanding the case to the trial court for discovery, id. at 142-44, and briefing, id. at 145 and 482, the Pennsylvania Superior Court affirmed the dismissal of the PCRA petition as untimely. Hill, 2019 WL 6972643, at *1.

Petitioner sought leave to appeal from the Pennsylvania Supreme Court on January 6, 2020. ECF No. 15-1 at 514 and 552. *Allocatur* was denied on May 27, 2020. Id. at 555.

Pursuant to the prisoner mailbox rule, the instant federal habeas action is deemed to have been initiated on November 10, 2020. ECF No. 1 at 15. See Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) ("we hold that a pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court.").

In the instant Petition, Petitioner raises three grounds for federal habeas relief.

GROUND ONE:  The Petitioner's Rights under the VI Amendment to effective assistance of counsel were violated when counsel knowingly provided the petitioner with false information about the victims medical records.

(a) Supporting facts[:] The Petitioner was informed by counsel that his actions and his actions alone caused the death of the victim. After careful review of the medical records by a medical expert, it becomes apparent that the death of the victims was cause by many other contributing facts as well as people, but not the petitioner as stated by defense counsel to the petitioner.

GROUND TWO: The Petitioners rights under the VI Amendment to effective assistance of counsel was violated when counsel failed to obtain an expert medical professional to review and dispute the states finding of the victims medical records.

(a) Supporting facts[:] Counsel for the Petitioner relied only on the state finding in the medical records and failed to obtain an expert in the field of medical for the defendant. The states finding after careful review were found to be faulty in all most all areas.

GROUND THREE:  The Petitioner's rights under the VIII Amendment were violated by the State Courts denying the PCRA/ Appeals because their opinion that Newly Discovered

Evidence does not apply and timebarred basing their opinion in an area of expertise that they do not possess.

(a) Supporting facts[:] The State Court denied the PCRA/Appeals saying it was time barred basing their opinion in an area of medical review that none of the courts possess. The Courts did not order a hearing in this matter nor did they seek the expertise medical experts to explain the medical records that were before them.

ECF No. 1 at 5, 7, and 8.  There is no fourth ground for relief in the Petition.  Id. at 10.[2]

Respondents answered the Petition on September 23, 2021.  ECF No. 15.  Petitioner submitted a Traverse November 29, 2021.  ECF No. 22.

This Court has thoroughly considered the parties' filings as well as the state court record of Petitioner's underlying convictions.  The Petition is ripe for consideration.

## II.   THE AEDPA STATUTE OF LIMITATIONS

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed within the applicable statute of limitations.  In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which generally established a strict one-year statute of limitations for the filing habeas petitions pursuant to Section 2254.  The applicable portion of the statute is as follows:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[2] Petitioner renumbers and rewords these grounds in his Traverse; however, the grounds asserted in the Petition remain substantively the same in the Traverse.  See generally ECF No. 22.  See also Rule 2(c) Rules Governing Section 2254 Petitions.  While Petitioner appears to attempt to assert a procedurally improper additional ground for relief as Ground Three in his Traverse, in reality, that is just a response to several arguments raised by Respondents in the Answer.  ECF No. 22 at 28-31.  Accordingly, this Court will address the grounds as they are raised in the Petition.

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The United States Court of Appeals for the Third Circuit has held that the statute of limitations set out in Section 2244(d) must be applied on a claim-by-claim basis. Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Fielder v. Lavan, 543 U.S. 1067 (2005). Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual claims raised in the petition. Typically, this is the date on which the petitioner's direct review concluded and the judgment became "final" for purposes of triggering the one-year period under Section 2244(d)(1)(A). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to Section 2244(d)(2). Third, the court must determine whether any of the other statutory or equitable exceptions should be applied on the facts presented. See, e.g., Munchinski v. Wilson, 807 F. Supp. 2d 242, 263 (W.D.

Pa. 2011), aff'd, 694 F.3d 308 (3d Cir. 2012) (citing Nara v. Frank, No 99-5, 2004 WL 825858, at *3 (W.D. Pa. Mar. 10, 2004)).

**III.    LEGAL ANALYSIS**

### A. Grounds One and Two of the Petition are untimely.

In Ground One and Ground Two, Petitioner attacks the alleged ineffective assistance of counsel leading up to his guilty plea. Accordingly, Grounds One and Two trigger under Section 2244(d)(1)(A) on the date on which Petitioner's conviction became final. As stated above, that date is March 6, 2008. Thus, in order to be timely under 28 U.S.C. § 2244(d), Grounds One and Two would have to have been submitted in a petition filed within a year of that date – or on or before March 6, 2009.

But no Petition had been filed by March 6, 2009. Nor was any state court post conviction petition filed by that date that would toll the statute of limitations. As such, Ground One and Ground Two are facially untimely.

### B. Ground Three is timely.

At Ground Three, on the other hand, Petitioner complains of alleged errors by the state court applying state law during Petitioner's PCRA proceedings. ECF No. 1 at 8 ("Petitioner's rights under the VIII Amendment were violated by the State Courts denying the PCRA/ Appeals because their opinion that Newly Discovered Evidence does not apply and timebarred basing their opinion in an area of expertise that they do not possess"). Thus, it did not trigger until Petitioner's PCRA proceedings ended when the Pennsylvania Supreme Court denied *allocatur* on May 27, 2020. ECF No. 15-1 at 555. Accordingly, in order to be timely, Ground Three would have to have been asserted on or before May 27, 2021. 28 U.S.C. § 2244(d). Because the Petition is deemed filed on November 10, 2020, ECF No. 1 at 15, Ground Three is timely.

**C. Petitioner has not demonstrated entitlement to equitable tolling for Grounds One and Two.**

In <u>Holland v. Florida</u>, 560 U.S. 631 (2010), the United States Supreme Court affirmed the availability of equitable tolling of the AEDPA's one year statute of limitations under appropriate circumstances. In its opinion, the Supreme Court first underscored that the one-year statute of limitations in the AEDPA was not jurisdictional, and "does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" <u>Id.</u> at 645 (quoting <u>Day v. McDonough</u>, 547 U.S. 198, 208 (2006)). Given that habeas corpus is, at its heart, an equitable form of relief, and with no well-defined congressional intent to the contrary, the Supreme Court concluded that it is proper, under the principles of equity, to toll the statutory one year period for filing a petition under Section 2254 in certain cases. <u>Id.</u> at 646-47.

In order for a delay in filing a habeas petition to qualify for equitable tolling, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." <u>Id.</u> at 649 (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418 (2005)). "Mere excusable neglect is not sufficient." <u>Miller v. New Jersey State Dep't of Corr.</u>, 145 F.3d 616, 619 (3d Cir. 1998). Additionally, "[i]n non-capital cases, attorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the 'extraordinary' circumstances required for equitable tolling." <u>Fahy v. Horn</u>, 240 F.3d 239, 244 (3d Cir. 2001) (citing cases).

While <u>Holland</u> did not involve an appeal from a decision of a court within the Third Circuit, it affirmed the practice of courts within this circuit of granting equitable tolling in cases where the above-mentioned conditions had been met. <u>See, e.g.</u>, <u>LaCava v. Kyler</u>, 398 F.3d 271, 275-76 (3d Cir. 2005). Importantly, the United States Court of Appeals for the Third Circuit has emphasized that "[e]quitable tolling is appropriate when 'the principles of equity would make the rigid

application of a limitation period unfair[.]'" <u>Id.</u> at 275 (quoting <u>Miller</u>, 145 F.3d at 618). Additionally, it should be applied only where it is "demanded by sound legal principles as well as the interests of justice." <u>Id.</u> (internal quotes and citations omitted).

Applying this standard to the present matter, it is apparent that there is nothing in the record before this Court that would support the equitable tolling of the AEDPA's statute of limitations in this case. To the contrary, as the Superior Court recognized, all of the medical evidence and expert reports that Petitioner attempts to raise as bases for Grounds One and Two here were in the possession of Petitioner's attorney, and "at no point does Appellant explain why he could not have discovered them a decade ago, merely by asking for his plea counsel's file." <u>Hill</u>, 2019 WL 6972643, at *2. Petitioner has failed to demonstrate diligence, and thus the application of equitable tolling, as to Grounds One and Two, is not appropriate.

**D. Petitioner has not demonstrated actual innocence.**

The statute of limitations also may be tolled if a petitioner establishes that he is actually innocent of the charges of which he has been convicted. <u>McQuiggan v. Perkins</u>, 569 U.S. 383, 398-99 (2013) (recognizing an actual innocence exception to the AEDPA's statute of limitations). An actual innocence claim must be based on "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [ ] that was not presented at trial." <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995).

That said, the Supreme Court cautions "that tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" <u>McQuiggan</u>, 569 U.S. at 386 (quoting <u>Schlup</u>, 513 U.S. at 329). "The gateway should open only when a petition presents 'evidence of innocence so strong that a

14

court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Id. at 401 (quoting Schlup, 513 U.S. at 316). "'[T]he timing of the [petition]' is a factor bearing on the 'reliability of th[e] evidence' purporting to show actual innocence." Id. at 386-87 (quoting Schlup, 513 U.S. at 332).

In the Third Circuit, "when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the Schlup actual innocence gateway." Reeves v. Fayette SCI, 897 F.3d 154, 164 (3d Cir. 2018), as amended (July 25, 2018).

Here, the alleged new, reliable evidence of actual innocence asserted by Petitioner includes the victim's medical records. ECF No. 15-1 at 189-481. It further includes the alleged opinion of an inmate, who was a former physician, that the victim did not die as a result of Petitioner having raped her. Instead, Petitioner indicates in his briefing that this individual concluded that "[t]his lady has clearly died from a failure to treat and Morphine overdosage." ECF No. 22 at 23. It is noteworthy that, while Petitioner recites the purported findings of this alleged former physician in his briefing, id. at 17-23, the record before this Court does not include a report, affidavit, declaration, or signed statement by this individual.

Petitioner also relies on a letter prepared for Petitioner's trial counsel on January 9, 2007, by Dr. Howard Reidbord. ECF No. 15-1 at 83. In this letter, Dr. Reidbord purports to have to have reviewed the victim's relevant medical records, as well as the autopsy report of the victim. Dr. Reidbord's letter states, in pertinent part:

> An autopsy was performed on August 21, 2004. The cause of death was attributed to acute bronchopneumonia. [The victim, Ms. Loth] was noted to be malnourished. Skin trauma was noted.

Subcutaneous and subgaleal hemorrhage was seen in the right frontal area. Other findings were not of clinical significance.

Based upon the medical and others records reviewed, it is my opinion, expressed with a reasonable degree of medical certainty that Mrs. Loth died as a result of acute bronchopneumonia with malnourishment as a contributory factor. There were no other findings at autopsy that would account for death.

Regarding the manner of death, the role of the physical assault as initiating a chain of events causing death is the major consideration. However, it light of the family's refusal to allow blood cultures or certain medications, the question arises as to whether sufficiently aggressive treatment was instituted during the hospitalization. For this reason, it is my opinion, expressed with a reasonable degree of medical certainty, that the manner of Mrs. Loth's death should be classified as undetermined.

All opinions expressed herein were done so with a reasonable degree of medical certainty.

Id. at 84.

Petitioner conceded that all of these records were in the possession of his trial counsel. ECF No. 22 at 32. He argues that he never was informed of the same, but instead was advised by counsel that the prosecution could prove beyond a reasonable doubt that Petitioner was responsible for the victim's death. Id. at 24 and 26.

It is unclear when Petitioner came into possession of any of the evidence in this case. For example, in his Traverse, Petitioner asserts that he did not acquire the evidence or become aware of its contents until after the Pennsylvania Superior Court remanded his PCRA case to the trial court for discovery in June of 2019. Id. at 24. However, in his *pro se* opposition to the PCRA trial court's notice of intention to dismiss, which is time-stamped February 19, 2019, Petitioner argues that he received various medical reports "on appeal" for the first time, which allegedly were reviewed by the same inmate former doctor. ECF No. 15-1 at 94-100.

16

Here, Petitioner fails to meet his burden under <u>McQuiggan</u> and <u>Schlup</u>.

First, the existence of the victim's medical records, as well as the autopsy report, were known to Petitioner at least at the time of his guilty plea colloquy. Plea/Sentence Hr'g Tr. dated Feb 5. 2008, at 18 ("I will mark as Commonwealth Exhibit No. 11 - - an autopsy was performed at Lab Case No. 04462 on August 21, 2004."). <u>Id.</u> at 17 ("I will mark for this Court Commonwealth's Exhibit 1 and 1. Commonwealth Exhibit No. 1 are the Scenery Heights medical records as well as the hospice medical records that are contained therein. And Commonwealth's Exhibit No. 2 are the Jefferson Hospital medical records which would document the findings of Dr. Dillon Gallon (phonetic)."). Petitioner's counsel stated on the record that she had seen these documents prior to their admission into evidence by the Court. <u>Id.</u> at 17 and 19. They are not new.

Second, the general content of those medical records and the autopsy report – if not all of the page-by-page specifics – were presented at Petitioner's guilty plea colloquy. The prosecution stated on the record that the victim "was living on a pureed diet to prevent aspiration ," <u>id.</u> at 9 and 12, that she developed bronchial pneumonia from aspiration at the hospital after her rape, <u>id.</u> at 18, that, because she was in hospice, only comfort measures were provided, <u>id.</u> at 11 and 18, and that she died from bronchial pneumonia on August 21, 2004, <u>id.</u> at 18-19. The results of the autopsy were read into the record. <u>Id.</u> at 18-19. Any potential disconnect in causation between Petitioner's rape of the victim, and her death by pneumonia in the hospital a week later, also is not new evidence.

Moreover, for these reasons, even if the existence of Dr. Reidbord's letter of January 9, 2007 was unknown to Petitioner, the lack of sufficiently aggressive treatment that Dr. Reidbord referenced as the basis for his opinion that the manner of the victim's death should have

been classified as "undetermined" was known to Petitioner – at the very latest – at his plea hearing. Compare ECF No. 15-1 at 84 ("Regarding the manner of death, the role of the physical assault as initiating a chain of events causing death is the major consideration. However, it [*sic*] light of the family's refusal to allow blood cultures or certain medication, the question arises as to whether sufficiently aggressive treatment was instituted during hospitalization.") with Plea/Sentencing Hr'g Tr. dated Feb. 5, 2008, at 18 ("due to the fact that there was hospice involved, comfort measures only were given to Ms. Loth, and as a result of the bronchial pneumonia, she died on August 21, 2004).

Fourth, the alleged opinion of an inmate former doctor presented in Petitioner's various briefings is not reliable evidence. Petitioner's recitation of this alleged opinion is not supported by any declaration, report, sworn statement, testimony – or even a signature – to indicate that this individual reviewed the victim's medical records, or even expressed the opinion that Petitioner was not responsible for the victim's death. The recitation provided by Petitioner is just argument, not evidence. ECF No. 22 at 17, 21-23. Petitioner bears the burden "to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006). Petitioner's restatement of the inmate former doctor's purported conclusions based on the victim's medical records fails to rise to this level.

To the extent that Petitioner argues that the medical evidence itself supports the conclusion that the victim died from other causes – such as an overdose of morphine or a failure to treat, ECF No. 22 at 23 – there is no new reliable medical expert evidence on the record that would support

such a conclusion.  Petitioner was aware that the victim was given only comfort care because she was in hospice.  Plea/Sentence Hr'g Tr. dated Feb 5. 2008, at 18.

Further, it is worth noting that the record indicates that the victim's medical records prior to, and after her rape were reviewed by Dr. Reidbord in the course of preparing his letter.  ECF No. 15-1 at 83-84.  Dr. Reidbord noted that the victim was given a morphine drip on the day after admission to the hospital after she was raped, and that the morphine dose was increased on August 21, 2004, after she was "had increasingly labored respirations[,]" and that she stopped breathing 90 minutes later.  Id. at 84.  See also ECF No. 15-1 at 321 and 339.  See also id. at 291 ("Family states that bolus of Morphine effective and patient much more comfortable today. , [sic] less crying noted, hands not clenched today, arms and legs much more relaxed.").

But even after reviewing the victim's medical records, Dr. Reidbord did not conclude that the victim had died of a morphine overdose.  Instead, he opined to Petitioner's counsel that, "[b]ased upon the medical and others records reviewed, it is my opinion, expressed with a reasonable degree of medical certainty that Mrs. Loth died as a result of acute bronchopneumonia with malnourishment as a contributory factor. There were no other findings at autopsy that would account for death."  ECF No. 15-1 at 84.

The autopsy report further does not support Petitioner's actual innocence claim.  Instead, it supports the conclusion that the victim died from pneumonia contracted while she was hospitalized.  Id. at 189-208; id. at 190 (OPINION: June Loth, a 79 year old female, died as a result of acute bronchopneumonia.   A physical assault, which was documented clinically, is a contributory factor.  MANNER OF DEATH: Homicide.").

Finally, as the Superior Court aptly explained in its opinion affirming the denial of Petitioner's PCRA appeal, none of this evidence established that Petitioner was actually innocent

19

of Third Degree Murder under Pennsylvania law.  Hill, 2019 WL 6972643, at *3 n.4.  Instead "'So long as the defendant's conduct started the chain of causation which led to the victim's death, criminal responsibility for the crime of homicide may properly be found.'"  Id.  (quoting Com. v. Shoup, 620 A.2d 15, 18 (Pa. Super. Ct. 1993).  See also id. ("Our Supreme Court has upheld a second-degree murder conviction upon similar facts.  See Com. v. Johnson, 284 A.2d 734, 734 (Pa. 1971) (affirming second-degree murder conviction where victim died of bronchopneumonia developed while she was being treated for burns caused by the defendant).").

A thorough review of the entirety of the record before this Court – including the medical evidence submitted by Petitioner as part of his PCRA proceedings – supports the conclusion that the elderly, infirm victim contracted aspiration pneumonia in the hospital, to which she was sent as a result of being raped by Petitioner.  She was in hospice, was provided only comfort care, and she perished from that pneumonia about one week later.  ECF No. 15-1 at 83-84, and 189-481  All of this was as described by the prosecution during Petitioner's guilty plea colloquy, as set forth above.

Thus, the undersigned concludes that Petitioner has failed to establish that, "in light of the new evidence, no juror, acting reasonably, would have voted to find [Petitioner] guilty beyond a reasonable doubt."  McQuiggan, 569 U.S. at 386.  Petitioner has failed to make a gateway claim of actual innocence to overcome the untimeliness of Grounds One and Two of the Petition.

Accordingly,  Grounds One and Two of the Petition are denied.

**E. Ground Three is not cognizable in federal habeas.**

At Ground Three, Petitioner attacks the state courts' finding that his claims were time-barred under the PCRA.  Specifically:

GROUND THREE:  The Petitioner's rights under the VIII Amendment were violated by the State Courts denying the PCRA/ Appeals because their opinion that Newly Discovered

Evidence does not apply and timebarred basing their opinion in an area of expertise that they do not possess.

(a) Supporting facts[:] The State Court denied the PCRA/ Appeals saying it was time barred basing their opinion in an area of medical review that none of the courts possess. The Courts did not order a hearing in this matter nor did they seek the expertise medical experts to explain the medical records that were before them.

ECF No. 1 at 8.

This Court's ability to grant habeas relief is limited to violations of the "Constitutional or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims of error by the PCRA trial court or PCRA Superior Court simply are not cognizable in a federal habeas action. See, e.g., Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation.") See also Lambert v. Blackwell, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCRA proceeding.")

Accordingly, federal habeas relief based on Ground Three is denied.

### F. Certificate of Appealability

Finally, a certificate of appealability will be denied because jurists of reason would not find it debatable whether Grounds One and Two of the Petition were barred by the AEDPA's one-year statute of limitations, or that he had failed to establish his actual innocence or entitlement to equitable tolling, or that Ground Three was not cognizable. See, e.g., Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).

## IV. CONCLUSION

For the foregoing reasons, the Petition, ECF No. 1, is denied, and a certificate of appealability is denied.  An appropriate Order follows.

Dated: March _5_, 2024                    BY THE COURT:

                                          _____
                                          MAUREEN P. KELLY
                                          UNITED STATES MAGISTRATE JUDGE

cc      DWIGHT M. HILL
        HL0129
        S.C.I. Camp Hill
        2500 Lisburn Rd.
        Camp Hill, PA 17011

        All counsel of record (*via* CM/ECF)